UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES E. COLEMAN,

                Petitioner,                Case No. 2:18-cv-10805
                                                    Hon. Sean F. Cox

v.

J.A. TERRIS,

                Respondent.
_____/

**OPINION AND ORDER: (1) GRANTING IN PART PETITION FOR WRIT OF HABEAS CORPUS AND VACATING PETITIONER'S SENTENCE WITH RESPECT TO COUNT TWO OF THE SUPERSEDING INFORMATION, AND (2) DENYING PETITIONER'S MOTION FOR APPOINTMENT OF A MEDICAL EXPERT**

I.

Federal prisoner James E. Coleman, confined at the Federal Correctional Institution in Milan, Michigan, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Coleman challenges the validity of his 2007 guilty plea conviction to two counts of delivery of a controlled substance resulting in death. 21 U.S.C. § 841(a)(1), (b)(1)(c). *See United States v. Coleman*, Eastern District of Michigan Case No. 06-20483. The case is on remand from the Sixth Circuit. *See Coleman v. Terris*, No. 19-1886 (6th Cir. April 24, 2020).

At the time of Coleman's conviction, the Government was not required to prove that the delivery of drugs was a but-for cause of death to sustain the sentencing enhancement under § 841(b)(1)(c). That changed with the Supreme Court's decision in *Burrage v. United States*, 571 U.S. 204 (2014). Under *Burrage*, to sustain the sentencing enhancement, the Government must prove that the delivery of drugs was either: (a) an independent, sufficient cause of the victim's death, or (b) a but-for cause. *See United States v. Allen*, 716 F. App'x 447, 450 (6th Cir. 2017).

Coleman claims that he is entitled to § 2241 habeas relief under *Burrage* because the decedents' autopsy and toxicology records from his case do not support a finding that his delivery of drugs was a but-for cause of their deaths. Respondent concedes that Coleman is entitled to habeas relief with respect to Count Two of the superseding information involving decedent McElmurry, and it leaves it to the Court's judgment to decide whether he is entitled to relief with respect to Count One involving decedent Jolly. For the reasons stated, the Court finds that Coleman has demonstrated entitlement to relief under § 2241 only with respect to Count Two.

II.

The Sixth Circuit recounted the pertinent facts regarding Coleman's guilty plea:

> The factual basis for Coleman's plea indicated that two drug users [Jolly and McElmurry] died of a drug overdose at some point after ingesting a substance provided by Coleman. Coleman also admitted at the plea hearing that he later found out the decedents "died from" the drugs he sold, but Coleman was not with either decedent at the time of death, nor did Coleman necessarily have a basis for knowing whether or not the decedents had ingested other drugs. There was no factual finding as to whether Coleman's drugs were the "but-for" cause of death or serious bodily injury.

*Coleman*, No. 19-1886, *3.

Pursuant to the plea agreement, Coleman was sentenced to concurrent terms of 365 months' imprisonment followed by 5 years of supervised release. (Case No. 06-20483, ECF No. 24.) Coleman filed a direct appeal that was voluntarily dismissed. (*Id*., ECF No. 32.) In 2009, he filed a motion under 28 U.S.C. § 2255, raising claims of ineffective assistance of counsel and insufficiency of the evidence, but it was denied. (*Id*., ECF Nos. 36, 56.) In 2015, Coleman filed a second § 2255 motion raising a claim for relief under *Burrage*, but it was transferred to the Sixth Circuit as a successive motion. (*Id*., ECF Nos. 74, 85.) The Sixth Circuit denied authorization to file the second § 2255 because *Burrage* did not announce a new rule of constitutional law (ECF No. 87.)

2

Coleman then filed the instant action under 28 U.S.C. § 2241, asserting he is entitled to relief under *Burrage* via the savings clause of § 2255(e). (Petition, ECF No. 1.) Petitioner claimed that the Government would have been unable to prove beyond a reasonable doubt that the controlled substances provided by him to the decedents were but-for causes of their deaths. (*Id*.) Coleman also requested discovery of the relevant autopsy and toxicology reports to substantiate his claim. (Motion, ECF Nos. 8.) The Court denied the petition because Petitioner admitted in the written plea agreement and during the plea hearing that the decedents "died from" drugs provided by him, which the Court took as an admission by Coleman that his drugs were the cause of the decedents' deaths. (Opinion, ECF No. 9.)

Petitioner appealed, and the Sixth Circuit reversed. The Sixth Circuit found that Petitioner's statements during the plea hearing did not provide a sufficient basis for overcoming his *Burrage* claim, and the Court erred in failing to order production of the records related to cause of death. (Opinion, ECF No. 17.) The Sixth Circuit reasoned that because Petitioner was not with the decedents when they died, and because he was not in a position to know whether they consumed other drugs that might have been the cause of their death, he could not have known at the time of his plea whether the drugs he provided were a but-for cause of death. (*Id*., at *4.) The Court remanded the case "for the district court to grant Coleman's motion to compel discovery and for further proceedings consistent with this Order." (*Id*.)

On remand, the Court ordered Respondent to produce the autopsy and toxicology reports for the decedents. (Order, ECF No. 19.) Respondent produced the reports, and it also obtained new supplemental reports. (Records Filed under Seal, ECF Nos. 26, 27, 34, and 35.)

After review of the records, Respondent filed a responsive pleading conceding that Petitioner is entitled to habeas relief with respect to Count Two involving decedent McElmurry,

3

and asking the Court to "exercise its discretion in making a just decision" with respect to Count One involving decedent Jolly because her case presents a closer question. (Respondent's Supp. Br., ECF No. 33, PageID.178, 180.)

Coleman asserts that he is entitled to habeas relief with respect to both counts. (Petitioner's Supp. Briefs., ECF Nos. 29 and 36.) Like Respondent, Coleman asserts that the reports indicate that McElmurry's cause of death was not medically determinable. He also argues that while Jolly died as a result of a drug overdose, the fact that the records show she had only fentanyl in her system whereas he sold heroin to her indicates that it was someone else's drugs that killed her. (ECF No. 36, PageID.224-227.)

III.

In order to establish entitlement to § 2241 relief, Coleman must demonstrate his actual innocence by showing:

> (1) the existence of a new interpretation of statutory law, (2) which was issued after the petitioner had a meaningful time to incorporate the new interpretation into his direct appeals or subsequent motions, (3) is retroactive, and (4) applies to the merits of the petition to make it more likely than not that no reasonable juror would have convicted him.

*Coleman*, No. 19-1886, *3 (quoting *Wooten v. Cauley*, 677 F.3d 303, 307-08 (6th Cir. 2012).

The Sixth Circuit ruled that Coleman has satisfied the first three factors: *Burrage* is a new case of statutory interpretation, it was issued after Coleman filed his direct appeal and his first motion under § 2255, and it has been held to be retroactively applicable. *Coleman*, *3. The remaining issue is whether Coleman can show that it is more likely than not that no reasonable juror would have convicted him in light of the asserted lack of but-for causation evidence.

As indicated, to sustain a sentencing enhancement under 21 U.S.C. § 841(b)(1)(c), *Burrage* requires the Government to prove a sufficient causal connection between the distribution of a drug

4

and the death of the victim. This can be done in two ways. The Government must show that the distribution was either: (a) an independent, sufficient cause of the victim's death, or (b) a but-for cause. *Allen*, 716 F. App'x at 450. But-for causation occurs when the distributed drug "'combines with other factors to produce' death, and death would not have occurred 'without the incremental effect' of the controlled substance." *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015) (quoting *Burrage*, 571 U.S. at 211). In other words, the Government must prove beyond a reasonable doubt that the decedent would not have died when he did in the absence of the distribution of drugs. *United States v. Miller*, 767 F.3d 585, 605 (6th Cir. 2014).

IV.

A.

The Court will consider the charges related to each decedent in turn.

With respect to Count Two of the Superseding Information involving decedent McElmurry, Respondent concedes that Coleman is entitled to relief. The Oakland County Medical Examiner autopsy report indicates that McElmurry died in the hospital on May 26, 2006, after he survived there for about a week following his hospitalization for his overdose. (ECF No. 27, PageID.135.) The report indicates a cause of death of "drug abuse and complications," with a contributory cause related to his morbid obesity, and an "undeterminable" manner of death. (*Id*.)

The report notes that McElmurry suffered from pulmonary congestion and edema, focal confluent bronchopneumonia, and cardiomegaly at the time of his death. (*Id*., PageID.140.) The toxicology report indicates a drug screen was performed on May 20, 2006, about twenty-four hours after his mother found McElmurry unconscious. The screen tested for the presence of cocaine, cocaine metabolites, fentanyl, opiates, and other drugs, but among those it only detected the presence of benzoylecgonine, the main metabolite of cocaine. (*Id*., PageID.142; ECF No. 34,

PageID.204.) About a week later, at the time of the autopsy, morphine and fentanyl were detected in the decedent's body. (ECF No. 27, PageID.142-143.)

> The report concluded that McElmurry
>
> died as a result of drug abuse and complications thereof. Morbid obesity was contributory. . . . In consideration of the circumstances surrounding his death, the results of the postmortem examination and toxicological analyses, the manner of death is undeterminable.

(*Id*., PageID.140.)

After receiving the autopsy and toxicology reports, Respondent requested additional information from the Oakland County Medical Examiner's Office. (ECF No. 34, PageID.203.) The letter response indicated that the decedent was reported to have purchased heroin on May 18, 2006, and he was found unresponsive by his mother at home the next morning. (*Id*.) He was transported to the hospital where he was intubated and placed on ventilator support. (*Id*.) He was taken off life support and pronounced dead a week later, on May 26, 2006. (*Id*.)

The letter again opined that the manner of death was "undeterminable." (*Id*., PageID.204.) In response to the Government's question whether McElmurry died from heroin and fentanyl overdose, the medical examiner who performed the autopsy responded:

> Mr. McElmurry died of complications of drug abuse that included cocaine abuse and opiates abuse. Due to the prolonged [period] Mr. McElmurry languished on life support (seven days) there is no definitive evidence of what specific opiates had been implicated.

(*Id*., PageID.204.)

The letter notes that there was evidence of cocaine abuse found in the blood sample drawn by the hospital on May 20, 2006, but the morphine and fentanyl found during the autopsy a week later was likely the result of those drugs being administered by the hospital while McElmurry was on life support. (*Id*., PageID.204.)

Respondent asked further questions of the medical examiner based on the discovery of morphine found at the time of the autopsy. Aiming to ascertain whether Coleman's drugs were a but-for cause of McElmurry's death despite his other medical conditions, Respondent asked: "3) Does the presence of morphine demonstrate that heroin was (partially) metabolized or otherwise processed in the body of Mr. MeElmurry? 4) But for those substances, would the decedent have died when he did?" (*Id.*, PageID.204.)

The problem with these two questions is that it turned out that the morphine and fentanyl found in McElmurry's body at the time of the autopsy was the result of those drugs being administered by the hospital. What Respondent really wanted to know was whether but for the substances that McElmurry ingested that rendered him unconscious and landed him in the hospital in the first place, would he have died when he did. But because the medical examiner interpreted the questions as referring to the drugs found in the decedent at the time of the autopsy, he regarded the but-for question as moot. (*Id.*, PageID.205.) Therefore, Respondent never received an answer one way or the other as to whether the medical examiner opined that but for ingesting the drugs that sent him to the hospital, McElmurry would have died when he did.

Nevertheless, in light of the medical examiner's expressed uncertainty regarding McElmurry's cause of death, Respondent concedes:

> McElmurry had health complications and issues not directly attributable to Coleman's drugs. And this decedent lived for several days after he overdosed. See Exhibit 1 reports. As shown by the Oakland County Medical Examiner, the exact cause of death cannot be ascertained. Consequently, the Government agrees that the "causing death" enhancement to Coleman's drug conviction can no longer be sustained.

(ECF No. 33, PageID.178.)

In light of the only evidence regarding the cause of McElmurry's death before the Court and Respondent's concession, the question is whether Coleman has shown that it is more likely

than not that no reasonable juror would have found that—when combined with the other factors to produce McElmurry's death—death would not have occurred without the incremental effect of the controlled substance delivered by Coleman. *Volkman*, 797 F.3d at 392; *Burrage*, 571 U.S. at 211.

The existing record supports the Government's position that question must be answered in the affirmative. McElmurry was found unresponsive by his mother the morning after he obtained Coleman's drugs. It seems as though McElmurry did not stay at Coleman's drug house after making his purchase, and instead he went home where he later ingested drugs. The drug screen performed at the hospital twenty-four hours after he was found by his mother showed a cocaine metabolite in his system. But there is no evidence in the record how much time elapsed between the time McElmurry bought drugs at Coleman's drug house and the time he ingested drugs at his home. That is, unlike the case involving Jolly discussed below, there is no indication in the record one way or the other whether Coleman's drugs were the only ones used by McElmurry that sent him to the hospital.

Furthermore, McElmurry survived on life support for about a week at the hospital, and the subsequent autopsy revealed other serious medical issues that might have killed him without the aid of any incremental effect of the drugs delivered by Coleman, even if those are the drugs he ingested. It would have been helpful to have the medical examiner's opinion on this point, but Respondent apparently chose not follow-up after receiving the medical examiner's supplemental report.

In light of Respondent's concession, and with no evidence otherwise suggesting that the drugs provided by Coleman were a but-for cause of McElmurry's death, Coleman has demonstrated that it is more likely than not that no reasonable juror would have found him guilty

of the sentence enhancement. Coleman's sentence with respect to Count Two will therefore be vacated.

B.

With respect to Count One and decedent Jolly, the question is much closer. The facts surrounding her death are important to a clear understanding of the parties' arguments. Unlike McElmurry, Jolly was an otherwise physically healthy teenager who was rendered unconscious at Coleman's drug house immediately after taking drugs there. The sentencing opinion from the criminal case summarizes the circumstances of her death:

> On May 24, 2006, Defendant, through an associate, supplied heroin to Lauren Jolly. As with Daniel McElmurry, this heroin contained fentanyl. After ingesting the heroin, Jolly was rendered unconscious. Defendant, believing Jolly was dead, instructed a third party to abandon Jolly's car and body. However, the third party took Jolly to St. John's Hospital where she was pronounced dead of a drug-induced overdose.

(Sent. Op., Case No. 06-20483, ECF No. 23, PageID.56).

The Wayne County Medical Examiner autopsy report indicates:

Lauren Jolly, a 17 year old white female, died of fentanyl intoxication. Toxicology revealed fentanyl in her blood. There was no evidence of cocaine or heroin use. In consideration of the autopsy findings and the circumstances surrounding this death, the manner of death is classified as an accident.

(ECF No. 26, PageID.130.)

The autopsy examination did not reveal any other pathologies contributing to Jolly's death. (*Id.*, at 131-133.)

After receipt of this report, Respondent requested further information from the Wayne County Medical Examiner's Office. (ECF No. 35, PageID.215.) The Chief Medical Examiner responded that the examiner who performed Jolly's autopsy no longer worked at their office, and the autopsy report and toxicology findings in the existing reports "did not document any findings

9

that could be associated with a distinct pathologic entity, i.e., there were no significant pathologic findings. The toxicology report documented the presence of fentanyl, which was the cause of death. The original file no longer exists." (*Id*.)

In light of this evidence, it is clear that fentanyl intoxication was the independent, sufficient cause of Jolly's death. *Allen*, 716 F. App'x at 450.

Coleman, however, does not dispute that fentanyl was the cause of Jolly's death. Rather, Coleman argues that the Government cannot prove that the fentanyl that killed Jolly was in the drugs that she bought at his drug house. Coleman asserts that the fact Jolly had *only* fentanyl in her body and not heroin raises the likelihood that Jolly obtained the drugs that killed her from another source, and that she brought those drugs with her to his drug house:

> Coleman contends that he is "actually innocent" as to Count One, as there is no evidence that the fentanyl that caused Jolly's death was from the mixture of heroin and fentanyl that Coleman's brother and/or "Ralph" sold to her as although Jolly was at Coleman's Drug Spot, however[.] [I]t is not at all unusual for drug users to have purchased drugs from several different dealers but in need of a place to ingest the drugs[.] So it [is] likely that decedent Jolly had purchased drugs before arriving at Coleman's Drug Spot in which was fentanyl and then bought drugs from Coleman's Drug Spot so she could in fact ingest the drugs there[.] This scenario is very likely and not uncommon. This would explain the fact that decedent Jolly's cause of death was fentanyl intoxication and there is no evidence of cocaine or heroin use. Toxicology revealed that fentanyl was in Jolly's blood, however, no heroin or heroin metabolites were in Jolly's blood as the evidence of this case reveals specifically that James E. Coleman plead guilty to "a mixture or substance containing the Schedule I controlled substance heroin and also containing the Schedule II controlled substance, fentanyl."

(Reply, ECF No. 36, PageID.224-225.)

Coleman suggests that his hypothesis is not as speculative as it might sound because the record of his criminal proceeding confirms his belief that he was specifically selling heroin on the date in question. At his plea hearing, Coleman expressed surprise that fentanyl was present in the drugs he was selling. (Plea Tr., Case No. 06-20483, ECF 31, PageID.101-103). Then again at

10

sentencing, Coleman expressed sympathy for the family of the victims, stating that he did not know that the heroin he sold the victims also contained fentanyl. (Sent. Tr. ECF No. 30, PageID.81-82.)

Coleman reasons that the newly discovered revelation in the autopsy record that *only* fentanyl was present in Jolly tends to indicate that he was wrong to assume at the time of his prosecution that he unwittingly passed-on fentanyl laced heroin to Jolly. Rather, he asserts that the toxicology results support the hypothesis that Jolly purchased pure fentanyl somewhere else and brought it with her to ingest at his drug house.

Respondent asserts that Coleman's argument is foreclosed by his guilty plea. Respondent notes that at the plea hearing, Coleman was advised that the exact nature of the drug delivered was not critical to his plea: "As long as Defendant knowingly distributed a controlled substance, he need [not] know the exact nature of the controlled substance." (Plea Tr., ECF No. 42-8, Page ID. 247.) Respondent notes that there is no *mens rea* requirement as to the composition or amount of the drug distributed to the decedent, so long as the defendant intended to distribute a controlled substance. *See United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003).

The argument misses the point. Coleman is not asserting that he is innocent because he thought he was distributing a controlled substance containing heroin, whereas records now show that he distributed pure fentanyl. Rather, Coleman is arguing that the fact no heroin was found in Jolly tends to show that the drugs that killed her came from somewhere else because he believes his drugs contained heroin. In other words, Coleman is claiming that the drugs he distributed were not even involved in Jolly's death.

That argument would have made for an interesting trial defense, and it is one that was likely available to him even prior to *Burrage*. The hypothesis that Jolly brought drugs with her that killed her, and that the drugs distributed by Coleman had nothing to do with her death, is not some

11

previously unavailable defense that is based on a new retroactive statutory interpretation. If Coleman is correct, the distribution of his drugs did not even play a contributing factor in Jolly's death because when she took the fentanyl she was immediately rendered unconscious. Such a claim, if believed, likely would have been a defense to the sentencing enhancement prior to *Burrage*. *See id.*, 571 U.S. at 208 (noting prior Eighth Circuit standard that distribution of drugs merely be a contributing factor in decedent's death). Query whether the Government would have pursued the sentencing enhancement on the theory that Coleman's distribution of drugs to Jolly was a contributing factor in her death merely because the purchase by Jolly allowed her to ingest drugs purchased elsewhere at Coleman's drug house.

Be that as it may, and even assuming *Burrage* places increased importance on Jolly's autopsy report that excuses his failure to explore this line of defense previously, the evidence of Coleman's actual innocence is nevertheless rather thin. Certainly, the autopsy report does not establish his innocence on its own. It merely shows that Jolly died from fentanyl without an indication of heroin use. That information is only exculpatory, however, if one accepts as true Coleman's claim that all the drugs he received and then redistributed on the date in question contained heroin. And the only thing Coleman can point to in the record to support that allegation are his own self-serving protestations at the guilty plea hearing and sentencing hearing that he assumed or believed he was selling heroin and was surprised to learn that fentanyl was in the drugs he distributed.

The basis for this belief by Coleman does not make it more likely than not that no reasonable juror would have nevertheless convicted him. In fact, the record evidence suggests that Coleman had no real idea of the actual composition of the drugs he was selling. At the guilty plea hearing, when asked who put fentanyl in the drugs, Coleman testified, "I really don't know, I just

acquired the drug, under my *assumption*, that it was heroin and I distributed the heroin." (Plea Tr. ECF No. 31, PageID.102.)[1] Coleman explained that the drugs were "fronted to me from an acquaintance." (*Id*., PageID.102-103.) Coleman did not personally sell the drugs he was fronted because "it was other people there that was working at this location . . . and I distribute some drugs to them and it was sold to her." (*Id*., PageID.103.) About fifty small individual packs were sold. (*Id*.) Coleman therefore had no real basis for knowing the composition of each pack of drugs that he directed to be sold – he was merely fronted drugs that he assumed included only heroin.

This is not a case, for example, where the defendant manufactured his own drugs, or where it was otherwise known (perhaps where there was a laboratory analysis following a raid) as to the chemical composition of drugs sold. In such a case, new evidence that the drugs that killed the decedent were different in composition from the drugs distributed would constitute evidence of actual innocence. Here, on the other hand, one can easily imagine the Government responding to Coleman's defense (if it had been presented at a trial) with: (a) evidence that Jolly was seen ingesting the same drugs she just bought at Coleman's drug house, and/or (b) arguing that the circumstances of Jolly's death in themselves together with the toxicology result support an inference that Coleman unwittingly passed-on packages of straight fentanyl along with the packages of heroin he thought he had been fronted.

---

[1] The Court notes that heroin and fentanyl share a similar white powdery appearance. *See, e.g., Walker v. State*, 167 N.E.3d 741 (Ind. App. 2021); *State v. Woodard*, 2017 Ohio App. LEXIS 3052, *21 (July 24, 2017)("Without the help of science and technology, it is not clear if a person could distinguish [whether] a bag contained both heroin and fentanyl."); *Commonwealth v. Raynor*, 2021 Pa. Super. Unpub. LEXIS 2241, *22 (Aug. 18, 2021)(narcotics officer "testified that it is not possible to tell heroin and fentanyl apart with the naked eye, as they are both 'white granular powder.' Forensic analysis is necessary to differentiate between the two drugs.")(citations to record omitted).

As Respondent notes, the Government was not required to prove that Coleman knew the exact type or quantity of drugs he was distributing. *United States v. Mahaffey*, 983 F.3d 238 (6th Cir. 2020). The Government did not have to prove Coleman knew he sold Jolly fentanyl. Rather, the statute requires nothing more than an intent to distribute a controlled substance. *United States v. Garcia*, 252 F.3d 838, 844 (6th Cir. 2001). Coleman admits that he believed he was distributing heroin. But the possibility that at least one packet of pure fentanyl may have been included among the drugs fronted to Coleman exists. It is at least a plausible hypothesis as Coleman's, and it undermines his claim that the autopsy report proves that Jolly died from ingesting drugs she brought with her. That is, a reasonable juror could easily have rejected Coleman's "it wasn't my drugs" defense because it would have been based only on his unfounded assumption that what he was fronted and passed on did not include any fentanyl. The Court is of the opinion that the hypothesis that Coleman unwittingly sold fentanyl to Jolly believing it to be heroin is at least as, if not more, likely than the hypothesis that Jolly brought the fentanyl with her to his drug house. Therefore, Coleman has not demonstrated that it is more likely than not that no reasonable juror would have found him guilty of the sentencing enhancement in light of the mere fact that Jolly died as a result of ingesting fentanyl and not heroin.

Coleman relies primarily on *United States v. Ewing*, 749 F. App'x. 317, 327-330 (6th Cir. 2018), as standing for the proposition that where the Government cannot disprove that the victim obtained drugs from a different source that caused their death, evidence is insufficient to sustain the sentencing enhancement under § 841(b)(1)(C). *Ewing* involved a challenge to the sufficiency of the evidence following a trial, during which the evidence left open a substantial window when the victim likely obtained and used drugs obtained from another source, killing him. In the specific facts of that case, the decedent "had multiple drugs in his system, including cocaine, which the

14

Government does not contend came from [the defendant]," and the decedent "clearly had access to other illicit substances in the days and hours before his overdose death." *Id.*, at 330.

The facts of *Ewing* are more in line with what happened to McElmurry than Jolly. In contrast here, Jolly became unconscious and unresponsive at Coleman's drug house immediately after ingesting drugs there. The theory that she might have brought those drugs with her does not present the same sort of gapping window in the evidence as in *Ewing*. It is based only on Coleman's assumption that fentanyl was not among the drugs he was fronted. "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Spearman*, 186 F.3d 743, 745 (6th Cir. 1999). While the hypothesis that Jolly brought with her the drugs that killed her is certainly one consistent with the available evidence, it is not a particularly compelling one. It is no more likely than the hypothesis that Coleman unwittingly redistributed some fentanyl with what he believed to be only heroin. And here, it is Coleman's burden to show that no reasonable juror would have found him guilty in light of the new toxicology information. *Wooten*, 677 F.3d at 307-08. Because that information is only exculpatory if one accepts as true his assumption that he did not sell fentanyl, he fails to establish his actual innocence.

To be clear: there exists a reasonable juror who would have found Coleman guilty of the sentencing enhancement despite the information Jolly died from ingesting fentanyl and not heroin. The circumstances of Jolly's death alone would have allowed for a reasonable juror to find beyond a reasonable doubt that Jolly ingested the drugs she had just bought at Coleman's drug house, and they were the independent, sufficient cause of her death. Accordingly, the petition for writ of habeas corpus will be denied with respect to Count One relating to decedent Jolly.

IV.

Finally, the Court notes that Coleman filed a motion that requested the appointment of a medical expert to aid in the interpretation of the reports. (Motion, ECF No. 22.) The Court denied this request without prejudice and informed Coleman that it would reconsider the matter after reviewing the reports and supplemental briefs. (Order, ECF No. 23.) In light of the foregoing analysis, the appointment of such an expert would be of no benefit. While an expert might have been helpful with respect to the records for Count Two, the Court is granting Coleman habeas relief as to that claim. With respect to Count One, there is nothing unclear about the records: Jolly died because she ingested fentanyl, and there was no heroin found in her body. The motion for appointment of a medical expert is therefore denied.

V.

For the reasons stated, the petition for writ of habeas corpus is **GRANTED IN PART**. The sentence for Count Two relating to decedent McElmurry is **VACATED**.

The petition for writ of habeas corpus is **DENIED** with respect to Count One relating to decedent Jolly.

The motion for appointment of a medical expert is **DENIED**.

A certificate of appealability is not needed to appeal the disposition of a habeas petition filed under 28 U.S.C. § 2241. *See Witham v. United States*, 355 F.3d 501, 504 (6th Cir. 2004). Therefore, Coleman need not request one from this Court should he seek to appeal this decision.

Should Coleman choose to appeal, he may proceed in forma pauperis because his appeal would not be frivolous and would be taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. 24(a).

**IT IS SO ORDERED**.

s/Sean F. Cox
Hon. Sean F. Cox
United States District Judge

Dated: September 23, 2021